IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FOROUZANDEH EMAMI, as an individual and as TRUSTEE, of the EMAMI FAMILY TRUST, dated March 4, 2024,

Plaintiff,

vs.

STATE FARM FIRE AND CASUALTY COMPANY,

Defendant.

Case No. 6:24-cv-01897-MC

**OPINION AND ORDER**

**MCSHANE, District Judge**

Plaintiffs, the Emamis, filed an insurance claim with Defendant, State Farm Fire and Casualty Company, after a fire destroyed their property. Disappointed with Defendant's handling of the claim, Plaintiffs filed this action for breach of contract. Pending before the Court is Defendant's Motion for Summary Judgment. Because Defendant paid the amounts owed under the insurance policy (the "Policy"), and because Plaintiffs failed to comply with their duties under the Policy, Defendant's Motion is GRANTED.

**STANDARD**

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The

court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 522 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

On July 3, 2023, a fire destroyed Plaintiffs' home (the "Dwelling"). Am. Compl. ¶ 11, ECF No. 21. The following day, Plaintiffs submitted a claim to Defendant. Def.'s Decl. Ex. 3, at 13, ECF No. 23. As of October 2024, Defendant paid Plaintiffs $313,645.91 for damage to the Dwelling under Coverage A, $82,544.40 for damage to personal property under Coverage B, and $39,210 for additional living expenses ("ALE") under Coverage C. Def.'s Decl. Ex. 8, at 4; Def.'s Decl. Ex. 3, at 1; Def.'s Decl. Ex. 26, at 2.

While Defendant paid Coverage A base limits under the Policy, Plaintiffs argue that because they did not receive additional coverage payments and replacement cost benefits ("RCV"), they were unable to replace their home and personal property. Pls.'s Resp. 4. In response, Defendant argues that because Plaintiffs did not comply with requests for information, did not submit evidence of expenses incurred, and have not rebuilt their property or repurchased their lost items, Plaintiffs are not entitled to further payments. Def.'s Mot. Summ. J. 2. Plaintiffs' claims hinge on whether each party complied with their respective obligations under the Policy.

### I. Breach of Contract

Defendant moves for summary judgment on Plaintiffs' breach of contract claims for dwelling damages (Coverage A), personal property loss (Coverage B), and ALE (Coverage C).

Because Defendant paid the full benefits due to Plaintiffs, Defendant is entitled to summary judgment on these claims.

**A. Coverage A**

Coverage A covers repair or replacement of the Dwelling. Def.'s Decl. Ex. 34, at 20. Coverage A has a limit of $312,480—including the inflation index's increased price. *Id.* at 2–3. Plaintiffs allege that Defendant has underpaid Coverage A benefits because they are entitled to increased limits beyond the $312,480 base limit. While Plaintiffs are correct that Coverage A provides benefits beyond the base limit in certain instances, whether that coverage is owed to Plaintiffs is subject to the terms of the relevant policy provisions.

The relevant provisions require Plaintiffs to incur costs over the base limits to receive additional payments. For example, Option ID, which Plaintiffs claim entitlement to, states:

> **Option ID – Increased Dwelling Limit.** ***We*** will settle losses to damaged ***building structures*** covered under **COVERAGE A – DWELLING** according to the **Loss Settlement Provision** shown in the ***Declarations***.
> 1. If the amount ***you*** actually and necessarily spend to repair or replace the damaged ***dwelling*** exceeds the limit of liability shown in the ***Declarations*** for Coverage A – Dwelling, ***we*** will pay the additional amounts not to exceed the Option ID limit shown in the ***Declarations***.

Def.'s Decl. Ex. 34, at 50.

Thus, for Plaintiffs to be entitled to increased limits, they must "actually and necessarily spend" beyond the base limit of liability. *Id.* The same is true for additional coverage under Option OL. *Id.* at 52 ("***we*** will not pay more under this coverage than the amount ***you*** actually spend: (1) for the increased cost to repair or rebuild the ***building structure***"). Further, additional coverage under Debris Removal is "included in the limit applying to the damaged property." *Id.* at 24. Here, because the debris removal was for the Dwelling, Plaintiffs' debris removal coverage is included in the $312,480 payment until they *incur* expenses over that limit. *Id.* (only when property damage

and debris removal exceed the Coverage A limit is an additional 5% of that limit available for debris removal expenses).

Additionally, the Policy includes the following statement regarding replacement costs under Coverage A: "to receive any additional payments on a replacement cost basis, ***you*** must complete the actual repair or replacement of the damaged part of the property[.]" *Id.* at 8. Plaintiffs have not provided Defendant with any evidence showing they have incurred additional costs under Coverage A. Even more, Plaintiffs have not repaired or rebuilt the Dwelling. Despite what Plaintiffs may claim is owed to them under the Policy, the terms of the Policy govern. *Nw. Pump & Equip. Co. v. Am. States Ins. Co.*, 144 Or. App. 222, 227 (1996). Because Plaintiffs have not begun rebuilding their home and have not incurred additional costs, they are not entitled to additional payments or RCV under Coverage A. *See Higgins v. Ins. Co. North Am.*, 256 Or. 151, 166 (1970) (finding plaintiffs ineligible for recovery under the 'Replacement Cost' extension of a policy where they had not expended anything in repairing or replacing the insured dwelling).

The Court must address one argument Plaintiffs made at oral argument. Plaintiffs argued that Defendant kept moving the goalposts regarding Coverage A payments; i.e., that Defendant first stated that Plaintiffs needed to submit a signed contract for the rebuild in order to receive RCV and then, when Plaintiffs submitted a signed contract, Defendant stated Plaintiffs would have to complete the rebuild to receive RCV. This is not borne out by the record before the Court. Assuming, without deciding, that simply submitting a signed contract entitled Plaintiffs to RCV, the evidence does not include a trace of any contract to rebuild the home signed by Plaintiffs. The closest Plaintiffs get to a signed contract is a two-page "General Contractor's Estimate" dated April 14, 2024. ECF No. 23–6. This cursory estimate is not a signed contract.

Additionally, Defendant's August 7, 2024, letter to Plaintiffs specifically provided that "[t]he submission of an estimate is not sufficient to demonstrate covered repairs are progressing[.]" ECF No. 23–26. Although that portion of the letter referred to ALE under Coverage C, the letter also confirmed that Defendant continued to wait "for additional documentation from you or your contractor to reconcile the differences in the estimates to rebuild your home." *Id.* Defendant warned Plaintiffs that due to the large discrepancy between the estimates, Defendant would "need supporting information from Stonewood to evaluate and properly reconcile the estimate and therefore determine if a supplement is owed under policy." *Id.* Nothing in the record indicates that Plaintiffs ever attempted to work with Defendant to address the differences between their builder's two–page estimate of $858,174.03 and Defendant's 69–page estimate of $395,987.27 to rebuild Plaintiffs' home. Additionally, as the record does not contain any signed contract to rebuild Plaintiffs' home, it clearly does not contain "a signed contract acceptable to [Defendant]." ECF No. 23–14. In short, Plaintiffs fail to create a genuine dispute of material fact that they were entitled to RCV under the Policy.

**B. Coverage B**

Coverage B covers personal property owned and used by the insured. Def.'s Decl. Ex. 34, at 21. In September 2023, Defendant provided Plaintiffs with a spreadsheet to inventory their personal property losses. Def.'s Decl. Ex. 16, at 1. On at least six occasions over the following 11 months, Defendant informed Plaintiffs that their claim was pending awaiting receipt of their personal property inventory. Def.'s Decl. Exs. 3, at 9; 17; 18; 22; 24; 26, at 1. Finally, in August 2024, Defendant received an initial inventory of personal property from Plaintiffs. Def.'s Decl. Ex. 28. In September 2024, and again in October 2024, Defendant requested additional information from Plaintiffs about certain items included in their personal property inventory. Def.'s Decl. Exs.

30, at 1, 5; 33, at 1. A few of the items Defendant requested more information on include over $15,000 in Nike shoes, $20,000 in stereo equipment, and nearly $20,000 in Louis Vuitton bags. Def.'s Dec. Ex. 33, at 3–4. Despite repeated requests, Plaintiffs provided no additional information regarding their personal property.[1]

Under the Policy, Plaintiffs' have a duty to "as often as [Defendant] reasonably require[s]: . . . provide [Defendant] with any requested records and documents[.]" Def.'s Decl. Ex. 34, at 35. The express terms of the Policy state that Defendant has a contractual right to request further information regarding lost contents and Plaintiffs have a contractual duty to provide the requested information. These requirements, common in insurance policies, require the insured to respond to similar requests from the insurer. *See Safeco Ins. Co. Or. v. Masood*, 264 Or. App. 173, 177 (2014) (interpreting a nearly identical policy provision to the quoted provision above and concluding that the unambiguous language obligated the insured "to provide the requested information" to the insurer). The Plaintiffs' duty here is particularly important because, "[b]y the very nature of things, the [insurance] company is obliged . . . to look to the [insured] . . . for the ascertainment of the actual loss sustained;" thus, the plaintiff must "answer faithfully and truly touching the amount of such loss." *Fowler v. Phoenix Ins. Co. Conn.*, 35 Or. 559, 563–64 (1899). However, despite multiple requests from Defendant for further information about Plaintiffs' personal property, Plaintiffs never fulfilled their duty.[2] Def.'s Decl. Exs. 30, at 1; 33, at 1. After receiving no response, Defendant paid Plaintiffs $82,544.40 in actual cash value ("ACV") under Coverage B for personal property with sufficient information for payment. Def.'s Decl. Ex. 8, at 2.

---

[1] The Court understands that paper receipts could be lost in a fire. But the record indicates that Plaintiffs simply failed to respond to Defendants' numerous requests for additional information regarding certain personal property included in Plaintiffs' inventory. As discussed below, Plaintiffs' silence violated the terms of the Policy.

[2] At oral argument, Plaintiff argued that Plaintiffs' depositions during this litigation fulfilled their duties to comply with Defendant's investigation of Plaintiffs' personal property requests. This argument is meritless and the record demonstrates that Plaintiffs simply failed to comply with Defendant's requests for more information as to certain claims of damaged personal property.

Plaintiffs do not explicitly address their failure to provide more information regarding certain items on their personal property inventory. Instead, Plaintiffs allege that under Oregon's "doctrine of prevention," Defendant's underpayment of Coverage B benefits prevented Plaintiffs from replacing their property and thus relieves them from compliance with the Policy terms to receive replacement cost benefits. Pls.' Resp. 11. Because Plaintiffs failed to comply with their duty under the Policy to provide sufficient information for their lost personal property, and because Plaintiffs ignored Defendant's offer of a $50,000 cash advance, the Court disagrees.

In Oregon, when a defendant prevents a plaintiff's performance of a contractual provision, the plaintiff is excused from performing under that contractual provision. *Anderson v. Allison*, 256 Or. 116, 121 (1970). For an insurance policy, where "an insurer denies coverage and refuses to pay an actual cash value settlement, some courts have held the insurer's action prevented the insured from complying with the replacement cost provisions of the contract as a matter of law." *Fitzgerald v. Am. Fam. Mut. Ins. Co.*, No. 6:14-cv-497-AA, 2015 WL 5896139, at *6 (D. Or. 2015). Because Defendant did not prevent Plaintiffs from complying with their obligations under the Policy, Plaintiffs' argument is meritless.

As noted above, Defendant paid Plaintiffs over $82,000 for damaged personal property. Defendant requested more information—on no less than six occasions—regarding only some of Plaintiffs' items. Plaintiffs failed to respond to Defendant's repeated requests. Additionally, two months after the fire, Defendant offered Plaintiffs a $50,000 cash advance under Coverage B to replace lost items from the Dwelling. Def.'s Decl. Ex. 15. As with the requests for more information, Defendant contacted Plaintiffs numerous times requesting a response regarding Defendant's proposed cash advance. Def.'s Decl. Exs. 3, at 9; 16, at 1; 17; 18; 22; 24. Plaintiffs never responded. Because Plaintiffs' unresponsiveness delayed Defendant's payment under

Coverage B, and because Defendant offered Plaintiffs a $50,000 cash advance under Plaintiffs' Coverage B coverage, no reasonable juror would find that Defendant prevented Plaintiffs from complying with the Policy.

Additionally, despite Defendant's offer of a $50,000 cash advance and a payment of $82,544.40 under Coverage B, Plaintiffs failed to provide any evidence indicating they replaced any personal property. This is fatal to Plaintiffs' claimed entitlement to RCV. The relevant policy terms regarding RCV under Coverage B state:

> a. ***We*** will pay the cost to repair or replace property covered under **SECTION I – PROPERTY COVERAGES, COVERAGE B – PERSONAL PROPERTY**, except for property listed in item b. below, subject to the following:
>
> (1) until repair or replacement is completed, ***we*** will pay only the ***actual cash value*** of the damaged property; . . .

Def.'s Decl. Ex. 34, at 34. As Plaintiffs failed to provide any evidence indicating that they replaced any personal property items, they were only entitled to receive ACV.

**C. Coverage C**

Coverage C covers ALE for the insured to maintain their standard of living while repairing or rebuilding their home. Def.'s Decl. Ex. 34, at 23. Defendants paid Plaintiffs ALE for hotel stays in the days after the fire. Def.'s Decl. Ex. 8, at 4. Further, Defendants paid Plaintiffs ALE for rent from July 2023 through June 2024. *Id.* In August 2024, Defendant informed Plaintiffs that unless Plaintiffs provided confirmation that they intended to replace the home, Defendant would not pay further ALE benefits. Def.'s Decl. Ex. 26, at 2. Additionally, Defendant informed Plaintiffs that ALE must be incurred to receive Coverage C payments. Def.'s Decl. Ex. 26, at 2.

Plaintiffs allege that Defendant did not pay the benefits owed under Coverage C because Defendant ceased to pay ALE 11 months after the loss. Pls.' Resp. 15. Because Plaintiffs did not comply with the Policy's requirement that they provide evidence of ALE expenses incurred after

June 30, 2024, and because Plaintiffs presented no confirmation that repairs were proceeding, their argument is meritless.

As noted, on August 7, 2024, Defendant informed Plaintiffs that per the Policy terms, they must submit documentation that repairs of the Dwelling were progressing to continue receiving ALE. Def.'s Decl. Ex. 26, at 2. The relevant policy provision states:

> **Coverage C – Loss of Use**
> 1. **Additional Living Expense**. When a ***loss insured*** causes the ***residence premises*** to become uninhabitable, ***we*** will pay the reasonable and necessary increase in cost incurred by an ***insured*** to maintain their normal standard of living for up to 24 months. ***Our*** payment is limited to incurred costs for the shortest of:
> a. the time required to repair or replace the premises;
> b. the time required for ***your*** household to settle elsewhere; or
> c. 24 months.

Def.'s Decl. Ex. 34, at 23.

As stated in the Policy, Plaintiffs must actually *incur* costs to receive ALE benefits. *Id.* Plaintiffs have not provided Defendant with any evidence of such costs. Def.'s Decl. ¶ 37. Additionally, Plaintiffs failed to provide Defendant with confirmation that repairs were imminent. Because no reasonable juror could conclude that Defendant owes further Coverage C payments to Plaintiffs, the Court grants Defendant's Motion for Summary Judgment on Plaintiffs' Coverage C breach of contract claim.

**<u>II. Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

Defendant moves for summary judgment on Plaintiffs' breach of implied covenant claim, arguing that it did not violate good faith and fair dealing in settling Plaintiffs' claim.

In Oregon, there is a presumption of good faith and fair dealing in contracts. *Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 661 (2007) (citing *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000)); *McKenzie v. Pac. Health & Life Ins. Co.*, 118 Or. App. 377, 381 (1993) (finding a "duty to determine, in good faith, whether a claim is covered" in an insurance policy). "[H]owever, the

implied covenant of good faith and fair dealing does not vary the substantive terms of the contract or impose obligations inconsistent with the terms of the contract." *Morrow*, 212 Or. App. at 662. The key to a bad faith claim on an insurance policy is "whether denial of a claim was reasonable." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 669 (9th Cir. 2003). A defendant must merely demonstrate "a genuine dispute as to coverage" for a bad faith claim to be dismissed on summary judgment. *Id.*

Plaintiffs admit that Defendant did not deny their coverage. Pls.' Resp. 4, 7, 14. Instead, Defendant requested, pursuant to the Policy, further information and evidence to substantiate Plaintiffs' claims prior to payment. "Under the contract, [Defendant] had an express contractual right to request information, and [Plaintiff] had an express contractual duty to provide the requested information." *Masood*, 264 Or. App. at 177. Where Plaintiffs complied with requests for information and evidence, Defendant promptly paid Plaintiffs' claims. Under these facts, no reasonable juror could find that Defendant breached the implied covenant of good faith and fair dealing and the Court grants Defendant's motion on this claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 22, is GRANTED.[3]

Dated this 17th day of November 2026.

/s/ Michael McShane
Michael McShane
United States District Judge

[3] Plaintiffs also brought a negligence per se claim. Because Defendant paid Plaintiffs what Plaintiffs were entitled to under the Policy, Plaintiffs' negligence claim necessarily fails. Additionally, by failing to respond to any negligence argument in their brief, Plaintiffs waived their negligence claim.